Toppin v. Moriarty.

NICHOLAS TOPPIN

v.

JOHN MORIARTY et al.

[Filed October 23d, 1899.]

1. There is no property right in a dead body.

2. A husband is charged with the *duty* of burying his wife, either in his character of administrator, if he sustain that character, or in his character of husband. After he has buried her, the body is in the custody of the law, and not in his custody.

3. Anyone seeking to remove a body once buried is subject to the jurisdiction of a court of equity, which, in this matter, is, in this country, the successor of the ecclesiastical courts.

4. Where a husband consented to his wife's request that she be buried in the same burial plot as her parents, and after she was accordingly buried in a plot intended for them, and her parents exchanged it for another in the same cemetery, where a suitable place was prepared for her remains at great expense, her husband, who knew of the exchange and the preparations, and made no objection to the removal until the preparations were complete, is precluded from interfering therewith.

On final hearing.

*Mr. John F. Marion* and *Mr. Washington B. Williams,* for the complainant.

*Mr. Charles B. Hughes,* for the defendants.

STEVENS, V. C.

The complainant seeks by injunction to restrain the defendant Moriarty from interfering with the removal of the remains of his daughter, Margaret, from one plot to another in the Roman Catholic Cemetery of the Holy Name.

The deceased was the wife of the defendant Moriarty. She died on January 10th, 1896, having been married to him about five years. She left no will, and in September, 1896, her hus-

band took out letters of administration on her estate. On her deathbed she expressed a wish to be buried in the same plot with her father and mother. To carry out this wish her father purchased, on the day before her funeral, for the sum of $660, the plot in which she now lies. She was buried there with the concurrence of her husband. Very shortly after the burial, her mother being dissatisfied with the situation of the plot, a new plot was obtained by exchange. The new plot was surrounded by a stone coping, and a statue of the Virgin and her child was placed within it at a cost of $2,800. The work was completed in November, 1896, and the complainant, having procured from the board of health a permit to remove the body, was about to disinter it, when the cemetery authorities were notified by Mr. Moriarty, who had quarreled with his wife's relatives after her death, that he objected. They thereupon refused to allow the removal to be made. This bill is filed against Moriarty and Bishop Wigger, in whom the title of the cemetery land is vested, to restrain them from interfering with the removal.

The bishop answers and avers his willingness to conform to any order that the court may make, and the controversy is, therefore, only between Toppin and Moriarty. Mr. Moriarty's insistment is that, inasmuch as his wife's body must be taken from its present resting-place in any event, its disposition belongs to him both as husband and administrator. The complainant's insistment is that he should be permitted to remove it to the new plot both because of his daughter's dying request and because Moriarty, by conduct to which I shall hereafter advert, is estopped from exercising his prior right, if he had any, to designate her last resting-place.

As the controversy is an unusual one, it will be useful to state at some length the legal rules applicable to the subject.

By the common law there is no property in a dead body (*Regina* v. *Sharpe, Dears. & B. 160; 40 Eng. L. & Eq. 581*), and the corpse cannot be the subject of larceny (*Regina* v. *Handyside, 2 East P. C. 652*), although its unauthorized removal is a misdemeanor. *Regina* v. *Sharpe, supra*. The executors

ordinarily have a right to its custody and possession until it is properly buried. *Regina* v. *Fox, 2 Ad. & E. (N. S.) 246; Lit. Burial 1.* A husband is liable for the necessary expenses of the decent interment, even though he be separated from his wife and although she be buried without his knowledge or request. *Ambrose* v. *Kerrison, 10 C. B. 776; Bradshaw* v. *Beard, 12 C. B. (N. S.) 344.* A parent was, by the law of England, bound to provide Christian burial—that is, burial in consecrated ground with the services of the church—for his child if he had the means. *Regina* v. *Vann, 2 Den. C. C. 325; 15 Jur. 1090.* A householder, even, in whose house a poor person died was (if no other person undertook the duty) bound to inter the body decently. And a stranger might enforce payment of the expense of burial out of the effects of the deceased and was not liable as executor *de son tort. Tugwell* v. *Heyman, 3 Campb. 298 (n).* "The right of the parishioner to burial," said Lord Stowell in *Gilbert* v. *Buzzard, 3 Phil. 350,* " strictly taken, is to be returned to his parent earth for dissolution and to be carried there for that purpose in a decent and inoffensive manner." In his *3 Inst. 203* Lord Coke says:

> "In every sepulchre that hath a monument two things are to be considered, viz., the monument and the sepulchre or burial of the dead. The burial of the cadaver—that is, *caro data vermis*—is *nullius in bonis* and belongs to ecclesiastical cognizance, but as to the monument, action is given, as hath been said, at the common law for the defacing thereof."

And in *Foster* v. *Dodd, 8 Best & S. 854,* Mr. Justice Byles said: "A dead body, by law, belongs to no one and is therefore under the protection of the public. If it lies in consecrated ground the ecclesiastical law will interpose for its protection, but whether in ground consecrated or unconsecrated, indignities offered to human remains in improperly or indecently disinterring them are the ground of an indictment."

In England, a body once buried could only be removed by order of the coroner for the purposes of an inquisition, or by a faculty (special dispensation) granted by the ordinary in his consistory court, or by license of one of the secretaries of state.

*Lit. Burial.* The granting or revocation of such a faculty is a judicial proceeding. *In re Pope, 5 Eng. L. & Eq. 585; Vestry of St. Pancras* v. *Vicar and Church Wardens of Parish of St. Martin in the Field, 6 Jur.* (*N. S.*) *540.* As in this country, where there is no ecclesiastical jurisdiction, "the remedy," says Judge Story in *Kurtz* v. *Beatty, 2 Pet. 566,* "must be sought, if at all, in the protecting power of a court of chancery, operating by injunction to preserve the repose of the ashes of the dead and the religious susceptibilities of the living." Accordingly, it has been uniformly held, in this country, that where questions involving the care and custody of a dead body arise, the litigation is necessarily in equity.

With these preliminary observations, I now come to the question at issue. Has the husband such a right to his wife's remains or to their custody, that he can prevent the complainant from re-interring them in the plot which has been prepared for them? That he has no property-right in them is manifest from the foregoing cases which declare that there can be no property in a dead body. Has he, then, *a right* to their *custody?* A right to the exclusive possession of a material thing, such as a dead body is, for an indefinite period would be, necessarily, a property-right, and so, I think, it may be safely asserted that the husband has no *such* right. What, then, is his right? It is said in *Weld* v. *Walker, 130 Mass. 422,* that because the husband's relationship to his wife is nearer than that of the next of kin, and because he is charged with the duty of burying his wife, it is his right to determine the place of her burial; although it is cautiously added, "it may be that the right of the husband is not an absolute right. If he should act in wanton disregard of the rights of the other relatives or to the feelings of the community, perhaps a court of equity would not aid him." Accordingly, it has been held in a number of cases that where the body is once buried in a suitable place, the surviving husband or wife is not, in general, at liberty to remove it against the wishes of the relatives in whose vault or burial-place it has been interred. *Wynkoop* v. *Wynkoop, 42 Pa. St. 293; Pierce* v. *Proprietors of Swan Point Cemetery, 10 R. I. 227; Guthrie* v. *Weaver, 1 Mo.*

Toppin v. Moriarty.

*App. 136; Secord* v. *Secord, 18 Abb. N. C. 78; Peters* v. *Peters, ·16 Stew. Eq. 140.*

If, in the case at bar, the wife's body had, with the husband's consent, been interred in the lot in which it now lies, and her father and mother had not exchanged this lot for another, it is entirely clear that he could not have removed it.   The peculiarity of the case consists in this, viz., that by reason of the action of the wife's parents it has become necessary to take it up and rebury it.

An examination of the authorities convinces me that what we are really dealing with in cases of this sort is a question of duty rather than of right, strictly so called.   In his character of administrator, if he sustain that character, the husband is by the law of the land charged with the duty of burial just as an executor is; and in his character of husband, he, first of all, because he is nearest to her, is, by the law of nature, charged with the same duty.   As incidental to this duty and in order that it may be properly performed, he is entrusted with the custody of the body until it is finally deposited in its permanent resting-place.   In England the duty, at least in former centuries, would have been discharged by seeing that his wife's remains were deposited in the church or church-yard of the parish in which she had lived.   Once buried there, he had no more right of control over them than the merest stranger.   Neither husband nor relatives could have disinterred the body without obtaining a faculty from the ordinary.   Not even the parson, in whom the freehold was vested, could have authorized a removal.   It was an indictable offence for a child even, to remove the body of a parent from its place of interment.   Judge Earl says, in *Regina* v. *Sharpe, 40 Eng. L. & Eq. 582:* "There is no authority for saying that relationship will justify the taking of a corpse away from the grave where it had been buried."   Nothing short of a faculty granted by the ordinary in his judicial capacity would have sufficed, and this faculty would have been conceded, not on the idea of right in the applicant, but of discretion in the ordinary, called into exercise by some reason of family sentiment or public convenience.   *Rector of St. Michael Bassishaw* v. *Par-*

Toppin v. Moriarty.

*ishioners, Pro. Div. 233, 244 (1893); Vicar of St. Botolph v. Parishioners, Pro. Div. 161 (1892); In re Kerr, Pro. Div. 284 (1894).*

The *status* of the present case is this : The title to the cemetery is vested in Bishop Wigger. The certificate received by the so-called lotowner is merely that T. has paid $——

"for one plot [describing it] in the cemetery of the Holy Name, to be used for burial purposes only, subject to the regulations of the cemetery and the rules of the Catholic Church in this diocese."

This certificate is signed not by the bishop but by the secretary of the cemetery. The legal situation then is that the bishop holds the land in trust for the holders of certificates, for burial purposes, just as the parson in England held the freehold of the church-yard upon a similar (though somewhat broader) trust. "The fee of a church or church-yard," says the chancellor of the consistory court of London, in *Vicar of St. Botolph v. Parishioners, Pro. Div. 167 (1892)*, "is by law in perpetual abeyance, whilst the freehold of the chancel is vested in the rector and of the church and church-yard in the incumbent, but in both cases for the use of the parishioners. The final control of the church and chancel and of the church-yard is vested in the chancellor, as ordinary, for this purpose." The use is a charitable use. *Newark v. Stockton, 17 Stew. Eq. 180.* Bishop Wigger submits himself to the judgment of this court. When his authorized agent canceled the first certificate and issued a new one he necessarily agreed that the body interred in the plot first purchased should be removed to the new plot.

Is the husband in a position to prevent the removal? If I am right in the view I have taken, namely, that he is not vested with a right but charged with a duty, it is apparent that in designating his wife's father's plot as the final resting-place of her remains and in seeing that she was interred there, he did what would ordinarily amount to a complete performance of that duty. If, in consequence of the new situation, a new duty has arisen, he is, in the performance of it, subject to the controlling power of this court as the successor of the ecclesiastical

court.  If nothing else appeared than that, for some reason or other, it was necessary to remove the body, then he, as husband and administrator, would, a controversy arising, be permitted to select another resting-place.  But there are two additional facts in the case at bar, which, it seems to me, make it the duty of the husband to allow his wife's body to be buried in the lot prepared for it.  These facts are, first, his wife's request that she should be buried with her family and his assent thereto after her death ; second, his conduct in assenting to the exchange of the lots and in allowing the work upon the new plot to proceed without objection, at great expense to the complainant.

First, as to his wife's verbal request.  If the husband had a legal right to his wife's remains I cannot conceive how her verbal request could have any effect.  In *Williams* v. *Williams, 20 Ch. Div. 659,* the court refused to give effect even to a testamentary direction relating to the disposition of testator's body. In many of the cases before cited, however, requests of this character have been allowed weight.  This could only have been on the theory that they bore upon the question of duty.  *In re Kerr, Pro. Div. 285 (1894),* is a strong case of this kind.  The deceased had expressed a wish that his body should be cremated, and application was made to the judge of the consistory court for a faculty to permit the remains, after cremation—a practice then entirely novel—to be placed in a niche of the wall of the Church of St. Saviours, in a sealed urn.  Permission to put the urn in the wall was refused, but leave was granted to put it in consecrated ground under the floor.  The judge said : "The court would not have been prepared to grant the faculty had not Mr. Kerr, as deposed to by his widow, expressed during his life his wish that his body, after his death, should be cremated."

Now, in the case at bar, we have not only proof of the wife's request, but of the husband's assent to it.  Her request was not that she should be buried in any particular plot, but in the plot in which her father and mother would be buried.  It is perfectly plain, on the evidence, that it was a matter of perfect indifference to Mr. Moriarty, when the first plot was purchased, whether that particular plot was selected or some other.  If the

plot subsequently acquired had then been brought to the attention of the parties, it would have been equally satisfactory to him. It was only because he subsequently quarreled with Mrs. Toppin, and, as he told Mr. Kelley, wished to put her to all the trouble he possibly could before he would allow her to remove the body, that he interfered to prevent the removal. I do not think that Mr. Moriarty was, in good faith, trying to perform a duty when he interfered. The substance of his consent was that his wife should repose by the side of her parents, and he gives no good reason for now withdrawing it.

In the second place, it is shown not only that he thus consented, but that he knew of the exchange of the lots and of the work that was being done on the second lot, and that he made no objection until that work was completed. It is said by complainant's witnesses that he approved of the exchange. This he denies, but he admits that Kelley, the contractor, told him that they were going to put up the monument on the new lot and have his wife's body removed there; and he testifies that he did not then object, because the contractor, whom he had himself introduced to Mr. Toppin, begged him not to say anything about it, as it might interfere with his work under the contract.

That the new plot is a suitable place in which to bury the body, is not and cannot be questioned. It is one of the best in the cemetery. The complainant has in his bill offered to allow the defendant to repose beside his wife. The defendant has as yet acquired no plot in which to inter it. It seems, therefore, quite plain that the defendant's duty now requires him to allow his wife's body to be taken to the place provided for it.

The complainant is entitled to an injunction.